**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 16-51148-RBK |
| RICOCHET ENERGY, INC., | § | |
| DEBTOR. | § | CHAPTER 11 |
| | § | |
| IN RE: | § | CASE NO. 16-51149-CAG |
| RICOCHET INTERESTS, LTD., | § | |
| | § | CHAPTER 11 |
| DEBTOR. | § | (Joint Administration Pending) |

**DECLARATION OF JERRY L. HAMBLIN IN SUPPORT**
**OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, JERRY L. HAMBLIN, do hereby declare, under penalty of perjury, that:

1.      I am the President and Chief Executive Officer for Ricochet Energy, Inc.

("Ricochet"), a Texas Corporation, with its principal place of business in San Antonio,

Texas.

2.      I also serve as Manager of Ricochet Management, LLC, as General

Partner of Ricochet Interests, Ltd. ("Interests") for each of the above-named debtors. In

my capacity as such, I have detailed knowledge of and experience with the business

and financial affairs of Ricochet and Ricochet Interests, who are debtors herein,

including Ricochet Management, LLC (Ricochet and Ricochet Interests collectively, the

("Debtors").

3.      As President, I am one of the officers of the Debtors responsible for

devising and implementing the Debtors' business plans and strategies, overseeing the

Debtors' financial, operational and legal affairs, and supervising the maintenance of

their books and records.  In addition, in my capacity as the Manager for Ricochet

Management, LLC, I have been involved in the Debtors' business plan and development process (the "Restructuring Process"), including, inter alia, (i) participating in the development, negotiation and implementation of various strategic alternatives for restructuring, reducing or modifying the Debtors' indebtedness, (ii) managing professionals engaged by the Debtors in connection with the Restructuring Process, (iii) supervising the preparation of documentation needed to implement the Restructuring Process, and (iv) consulting on a regular basis with the Debtors' other officers, executives, and members of the Debtors, with respect to the foregoing.

4.      Today (the "Petition Date"), the Debtors filed voluntary petitions (the "Petitions") for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), in an effort to preserve and maximize the value of their Chapter 11 estates.

5.      The Debtors intend to operate their businesses and to manage their assets as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

6.      I am advised by counsel that this Court has jurisdiction over these Chapter 11 cases pursuant to 28 U.S.C. §§ 157 and 1334 and venue is proper in the United States Bankruptcy Court for the Western District of Texas pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The Debtors have requested certain relief in "first day" applications and motions filed with the Court (collectively, the "First Day Motions") in order to minimize potential adverse effects of the bankruptcy filings and to maximize the value of their estates. I submit this Declaration to assist the Court and parties-in-interest in

understanding the circumstances that led to the commencement of these Chapter 11 cases and in support of the Debtors' voluntary petitions and First Day Motions.

8.       Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' management teams and other personnel, my knowledge and review of relevant documents including the Debtors' books and records, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition. If called upon to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

9.       I am familiar with the contents of each First Day Motion (including the exhibits) and the facts set forth therein are true and correct to the best of my knowledge. The relief sought in each First Day Motion will provide an orderly transition of the Debtors into these Chapter 11 cases and ultimately permit the Debtors to reorganize. Further, I believe the relief sought in the First Day Motions is in each case narrowly tailored and necessary to achieve the goals identified above, and, accordingly, best serves the interests of the Debtors' estates and stakeholders.

I.     **Overview of the Debtors' Businesses and History**

A.     **The Debtors' Businesses**

10.     The Debtors are independent oil and gas companies operating oil and gas exploratory and production businesses in South Texas.  Ricochet has been in continuous business since 1996, acquiring, developing and operating oil and gas properties.   Interests has been in continuous business since 2000, acquiring and

investing in oil and gas assets and properties. Debtors' activities involve acquisition, investments, operating and disposition of various oil and gas assets and include royalty owners interests currently involving approximately 30 oil and gas wells, along with numerous oil and gas leases and prospects or other ideas.

### B.    The Debtors' Corporate Structure

11.    Ricochet, a Texas corporation, chartered on April 15, 1996. Jerry L. Hamblin and Thomas A. Lamont were the initial stockholders. Effective December 31, 2006, as referenced within that Master Agreement to Sell, Transfer and Assign and/or Dissolve Certain Business Interests, Lamont conveyed all of his shares of stock to Hamblin, making Hamblin the sole stockholder.

12.    Interests, is a Texas Limited Partnership, owned 99% by Hamblin (Limited Partner) and 1% by Ricochet Management, LLC (General Partner) – established in 2000 to invest in working interest in oil and gas exploration and development through Ricochet, as Operator. Interests owns various working interests in oil and gas production. The J.O. Walker, Jr. Family Limited Partnership is a secured creditor of Interests.

13.    Ricochet Management, LLC ("Management") – a non-debtor, is owned 100% by Hamblin, established in 2000 to serve as general partner to Interests, and other non-debtor entities. Management handles employees and employee benefits for Ricochet and Interests.

### C.    The Debtors' History

14.    Ricochet was founded in 1996 to operate oil and gas properties. On December 31, 2006 - Jerry L. Hamblin purchased the interest of Lamont – as set forth within paragraph 11 above.

15.    Due to a variety of external economic factors that adversely affected the companies' operating performance beginning in late 2014, Ricochet and Interests elected to file for Chapter 11 relief.

16.    The Debtors' employee operations are, and have been, managed by Management pursuant to a Management Agreement dated January 1, 2015. Management provides operational oversight and all professional and administrative services for the Debtors.  In return for the services provided, Management receives reimbursement of allocated costs and expenses and a management fee.  A separate entity, Management, provides employment and wage related services for the Debtors.

**D.    Debt Structure**

17.    As of the Petition Date, Interests is the primary obligor on a revolving credit line the original principal amount of $2,325,000.00 (the "Loan").  Interests pledged various assets as collateral to secure the Loan evidenced by a Deed of Trust, Assignment of Production, Security Agreement and Financing Statement.  The Loan is guaranteed by Jerry Hamblin.  In addition, the Debtors have unsecured debt of approximately $9,000,000.00 in ordinary course trade debt.

**II.    Events Leading to the Debtors' Bankruptcy Filing**

18.    Events leading to the filing for relief are directly related to the decline of oil and gas prices occurring over the last 1-1/2 years.  Gross income has dropped significantly due to declining oil and gas prices limiting net income, restricting the inability to satisfy current obligations.  This decline in revenue cause by declining market prices has resulted in severe cash flow deficiencies.

19.    As of the Petition Date, Ricochet continues to operate approximately 30

wells and prospects in or around south Texas.

20.     The Debtors have diligently evaluated, in consultation with their professionals, a number of options to address the Debtors' current financial issues. These efforts have included consideration of sale of some of Debtors' interest in oil and gas properties and attempts of capital restructure and refinance.  Ultimately those efforts were unsuccessful requiring Debtors to seek relief under the Bankruptcy Code.

21.     The Debtors have commenced these cases in order to fully implement their restructuring efforts and to deal with current operating liabilities.  The Debtors believe that a combination of renewed sales efforts combined with an increase in oil and gas prices will provide sufficient cash to fund the Debtors' ordinary course expenses and enable the Debtors to become a profitable enterprise.

## III.    First Day Motions

22.     Concurrently with the Chapter 11 petitions, the Debtors are filing "first-day" applications and motions described below (collectively, the "First Day Motions"). The relief sought in the various First Day Motions will allow the Debtors to, among other things, (a) establish certain administrative procedures to promote a seamless transition into Chapter 11; (b) continue to operate effectively; and (c) protect their assets and interests from any actions that may be taken by third parties.

23.     I submit this Declaration in support of the Debtors' petitions and First Day Motions filed with the Court in connection with the commencement of these cases. Below is a brief discussion of the Debtor's First Day Motions and an explanation of why, in my belief, such motions are critical to the success of the Chapter 11 Cases. More detailed descriptions of the facts pertaining to the Debtors'

operations and the bases for the requested relief in each motion can be found in the relevant First Day Motions.

24.  I have reviewed each of the First Day Motions (including the exhibits and schedules attached thereto) and, to the best of my knowledge, believe the facts set forth therein are true and correct. Such representation is based upon information and belief and through my review of various materials and information, as well as my experience and knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Motions.

25.  As described more fully below, the relief requested in the First Day Motions was carefully tailored by the Debtors, in consultation with their professionals, to ensure the Debtors' immediate operational needs are met, and that the Debtors suffer no immediate and irreparable harm. At all times the Debtors' management and professionals remained cognizant of the limitations imposed on debtors-in-possession and, in light of those limitations, the Debtors narrowed the relief requested at the outset of these cases to those issues that require urgent relief to sustain the Debtors' immediate operability.

### A.  Motion for Joint Administration

26.  The Debtors believe that many of the motions, applications, hearings and orders that will arise in these Chapter 11 Cases will jointly affect both Debtors. Under these circumstances, the Debtors believe the interest of the Debtors, their estates, their creditors and other parties in interest would be best served by the joint administration of these Chapter 11 Cases for procedural purposes only. The Debtors

further believe that joint administration of these Chapter 11 Cases will ease the administrative burden on the Court and all parties in interest, and will protect creditors of the respective estates against potential conflicts of interest. For these reasons, the Debtors submit, and I believe, the relief requested in this motion is in the best interest of the Debtors, their estates and their creditors, and therefore should be approved.

**B.      Motion for Authority to Use Cash Management System, Bank Accounts, and Business Forms; Perform Intercompany Transactions; Authority for Banks and Financial Institutions to Honor and Process All Related Check and Electronic Payment Requests**

27.     By this motion (the "Cash Management Motion"), the Debtors seek entry of an order (i) authorizing the Debtors to, in the ordinary course of business, (a) use existing cash management system, pre-petition bank accounts, and pre-petition business forms (without reference to the Debtors' status as a debtor-in-possession) and (b) perform intercompany transactions, (ii) authorizing the Debtors' banks and financial institutions to (a) maintain, service, and administer the Debtors' bank accounts and (b) honor and process all related checks and electronic payment requests consistent with the relief requested herein, and (iii) waiving the Debtors' compliance with the guidelines set forth in section 345(b) of the Bankruptcy Code.

28.     The Debtors have an established cash management system they utilize to collect, manage, and disburse funds used in the Debtors' operations in the ordinary course of business (the "Cash Management System").

29.     The Cash Management System enables the Debtors to facilitate their cash forecasting and reporting, monitor the collection and disbursement of funds, and maintain control over the administration of their bank accounts.

30. As discussed in greater detail in the Cash Management Motion, as of the Petition Date, the Debtors maintain their bank accounts with Texas Community Bank in San Antonio, Texas.

31. The Debtors currently generate and receive cash from the revenue generated pursuant to the operation of the Debtors' oil and gas operations, which include income as operator, income from production and income from prospects generation agreements.

32. In connection with the Cash Management System, the Debtors maintains two (2) operating accounts and one money market account in their name (the "Bank Accounts"). In the ordinary course of business, the Debtors routinely transfer money between the Bank Accounts via wire transfers and other electronic funds transfers. The number of intercompany transfers amongst the Debtors' Bank Accounts can be numerous on any given day derived from oil and gas production. Ricochet as operator receives income on behalf of hundreds of royalty and working interest owners on various producing wells. Thus, there could be inflow with deposits and outflow with disbursements. The amount of funds that flow through the Cash Management System is highly variable in that the funds are derived from production of oil and gas from numerous wells and is purchased at various price intervals depending on market updates.

33. As of the Petition Date, the active Cash Management System consists of the following categories of Bank Accounts and other related cash management activities:

34. If a customer makes payment by cash or check, daily deposits are made

into the checking account of Ricochet and swept into the Ricochet operating account on a daily basis.

The Debtors' Existing Business Forms and Checks

35.     In the ordinary course of business, the Debtors use numerous business forms, including, without limitation, checks, business cards, letterhead, purchase orders, and invoices (collectively, the "Business Forms"). Given the Debtors' well established cash management structure, to minimize the expense to the Debtors' estates associated with developing and/or purchasing new forms, the delay in conducting business prior to obtaining such forms, and the confusion of suppliers and other vendors, the Debtors seek authority to continue to use their Business Forms as such forms existed immediately prior to the Petition Date, without reference therein to the Debtors' status as a debtor in possession.

Bank Fees and Charges

36.     In the ordinary course, the Debtors' Cash Management Banks charge, and the Debtors pay, honor, or allow the deduction from the appropriate account, certain service and other fees, costs, charges, and expenses (collectively, the "Bank Fees").

37.     The Debtors request authority to use the Cash Management System during the pendency of these Chapter 11 Cases in accordance with the ordinary course of the Debtors' businesses.

38.     The Debtors further request that the Court authorize the Cash Management Banks to (a) continue to maintain, service, and administer the Bank Accounts, (b) debit the Bank Accounts in the ordinary course of business on account

of (i) all checks drawn on the Bank Accounts that are cashed at the Cash Management Banks or exchanged for cashier's checks by the payees thereof prior to the Petition Date, (ii) all checks or other items deposited in one of the Bank Accounts at the Cash Management Banks prior to the Petition Date that have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, and (iii) all undisputed pre petition amounts outstanding as of the date hereof, if any, owed to any Cash Management Bank as service charges for the maintenance of any aspect of the applicable Cash Management System, and (c) recognize and give effect to the transfers between the various Bank Accounts as contemplated herein.

39.     Furthermore, to guard against improper transfers resulting from the post-petition honoring of prepetition obligations, the Debtors request that their banks be directed not to honor, subject to certain exceptions approved by the Court (such as employee benefits and utilities), any checks and disbursements, including automatic or "ACH" withdrawals drawn on the Debtors' bank accounts, or for obligations, prior to the Petition Date.

40.     Allowing the Debtors to maintain uninterrupted use of the Cash Management System and Bank Accounts will accomplish the dual goals of minimizing the disruption to the Debtors' operations and satisfying the United States Trustee's Operating Guidelines. To ensure that all transfers and transactions will be documented in its books and records, the Debtors will maintain records of all transfers within the Cash Management System.

41.     Here, the Debtors have utilized the Cash Management System as part

of their ordinary and usual business practices and as such, the Debtors believe that use of the Cash Management System falls within the purview of ordinary course transactions permitted under section 363(c)(1) of the Bankruptcy Code. Moreover, appropriate circumstances exist for the Courts to authorize the Debtors' use of the Cash Management System under sections 363(b)(1) and section 105(a) of the Bankruptcy Code.

42.     As an initial matter, the relief requested in this Motion will help minimize any disruption in the Debtors' business operations during the period between the Petition Date and the Debtors' emergence from Chapter 11 and preserve the value of the Debtors' estates.

43.     Second, strict adherence to the Guidelines of the Office of the United States Trustee (the "U.S. Trustee Guidelines") will prove to be exceedingly burdensome to the Debtors and management, reduce efficiencies, and cause unnecessary expense. Absent the relief requested herein, the Debtors will be required to, among other things, (a) close all existing bank accounts and open new debtor in possession accounts, (b) maintain a separate debtor in possession account for cash collateral, (c) obtain checks that bear the designation "debtor in possession", and (d) create new systems for manually issuing checks and paying post petition obligations. The delays that will result from opening the new accounts and revising cash management procedures would disrupt the Debtors' business operations at this critical time, have little or no benefit to the Debtors' estate, and potentially erode the value of the Debtors' business. Accordingly, the Debtors should be allowed to use the Cash Management System consistent with the ordinary course of the Debtors' business.

44.     The Debtors use numerous varieties of Business Forms in the ordinary course of business. By virtue of the nature and scope of the Debtors' business operations, and in order to minimize expenses to the Debtors' estate, it is important that the Debtors be permitted to continue using the existing Business Forms without alteration or change, except as requested herein.

45.     Furthermore, parties doing business directly with the Debtors undoubtedly will be aware of the Debtors' status as a debtor in possession as a result of the communications and notice of the commencement of these Chapter 11 Cases that the Debtors will distribute to such parties. Accordingly, the requirement to change the Business Forms is unnecessary, would be unduly burdensome, and should be waived.

46.     The U.S. Trustee Guidelines require that all receipts and all disbursements of estate funds be by check with a notation representing the reason for the disbursement. Given the Debtors' current operations, it is necessary for the Debtors to conduct transactions by debit, wire, automated clearing house ("ACH") transfers, ACH credit, ACH debit, and other similar methods of electronic transfers. Denying the Debtors the opportunity to conduct transactions by these methods would likely interfere with the Debtors' performance under its contracts and obligations, unnecessarily distract the Debtors and its management from the Debtors' business operations, and create additional costs to be borne by the Debtors and their creditors. Accordingly, the Debtors believe that it is imperative that the Cash Management Banks be authorized to continue to pay, honor, and execute any and all debit instructions, wires, ACH payments, and other forms of electronic transfers issued and drawn on

the Bank Accounts after the Petition Date.

47.     The continued performance of the ordinary course Intercompany Transactions is integral to ensure the Debtors' ability to operate their businesses and preserve and maintain the Debtors' going concern value for the benefit of all parties in interest. Because the Debtors' businesses are operationally and functionally interconnected to their affiliates, they maintain the centralized Cash Management System described above that necessarily requires numerous Intercompany Transactions. Altering this system would require the Debtors to divert attention from their restructuring efforts and the desired smooth transition into operating as debtors in possession. In contrast, the continuation of the Intercompany Transactions helps preserve the "business as usual" atmosphere and avoids the unnecessary distractions that inevitably would be associated with any substantial disruption in the Cash Management System. Accordingly, the Debtors should be expressly authorized to continue performing the Intercompany Transactions consistent with the Debtors' customary practice.

48.     Based on the foregoing, the Debtors submit that the relief requested is necessary and appropriate, is in the best interests of their estates, creditors, and other parties in interest, and should be granted in all respects. Moreover, this relief is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

### C.     Motion for Extension of Time to File Schedules and Statements, and Extending the Time to Schedule the Meeting of Creditors

49.     Pursuant to the Motion to Extend Time, the Debtors seek entry of an order (i) extending the time within which the Debtors must file their (a) statement of financial affairs, (b) schedule of assets and liabilities, (c) schedule of current income

and expenditures, and (d) schedule of executory contracts and unexpired leases (collectively, the "Schedules and Statements"); and (ii) authorizing the Office of the United States Trustee for the Western District of Texas to schedule the meeting of creditors under section 341 of the Bankruptcy Code after the forty (40) day deadline imposed by Bankruptcy Rule 2003(a).

50.     The Debtors have begun compiling the information required to complete their Schedules and Statements. Nevertheless, as a consequence of the complexity of the Debtors' business operations, coupled with the limited time and resources available, the Debtors have not yet finished gathering such information.

51.     Given the numerous critical operational matters that the Debtors' accounting and legal personnel must address in the early days of these Chapter 11 Cases, and the volume of information that must be reviewed, prepared, and included in their Schedules and Statements, the Debtors anticipate that they will be unable to complete their Schedules and Statements within the time required under Bankruptcy Rule 1007. Moreover, I believe that focusing the attention of key accounting and legal personnel on vital operational and restructuring matters during the critical first weeks after filing the Chapter 11 Cases, rather than on preparing their Schedules and Statements, will facilitate the Debtors' smooth transition into Chapter 11 and maximize the value of the Debtors' estates for the benefit of creditors and all parties in interest. Accordingly, the Debtors seek an additional thirty (30) days by which to file the Debtors' Schedules and Statements with the Court.

52.     The Debtors require extra time to prepare and file their Schedules and

Statements. While the Debtors have commenced the task of gathering the necessary information that will enable them to finalize the Schedules and Statements, the nature and scope of the Debtors' operations require them to maintain voluminous records and intricate accounting systems. The Debtors also have limited staff available to perform the required internal review of such financial records and affairs. Thus, the scope of the Debtors' businesses, the limited staff available to perform the required preparation activities, the numerous critical operational matters that their accounting and legal personnel must address in the early weeks of the Chapter 11 Cases, the pressures incident to the commencement of the Chapter 11 Cases, and the fact that certain prepetition invoices have not yet been received or entered into their accounting systems provide ample cause justifying, if not necessitating, an additional thirty (30) days to file their Schedules and Statements.

53.    In addition, preparing and finalizing their Schedules and Statements within the next month will unnecessarily distract management's and the Debtors' professionals' attention from (a) focusing on the Debtors' business operations and reorganization efforts, including preservation of relationships with creditors and other parties-in-interest and (b) ensuring the Debtors' smooth transition into Chapter 11 during a sensitive time.

54.    The Debtors anticipate that the United States Trustee will soon schedule the meeting of creditors required by section 341 of the Bankruptcy Code in accordance with Bankruptcy Rule 2003(a), but that the United States Trustee may desire to instead schedule the meeting after the Debtors' Schedules and Statements are filed. To the extent such relief is necessary, the Debtors also request the Court

authorize the United States Trustee to schedule the Section 341 meeting after the 40-day deadline imposed by Bankruptcy Rule 2003(a).

55.    The Debtors operate on a monthly accounting cycle beginning 1st of the month and ending last day of the month ("Monthly Accounting Cycle").  As of the Petition Date, the Debtors last complete Monthly Accounting Cycle ended on April 30, 2016.

56.    For these reasons, the Debtors request that the Court grant the Debtors an additional thirty (30) days to file their Schedules and Statements, authorize the U.S. Trustee to schedule the 341 meeting after the 40-day deadline is imposed pursuant to Bankruptcy Rule 2003(a).

### D. Motion for Authorization, But Not Directing, Debtors to Pay Taxes and Fees, and Authorizing Banks and Financial Institutions to Honor and Process All Related Checks and Electronic Payment Requests

57.    By this motion, the Debtors request an Order authorizing, but not directing, the Debtors to pay certain unpaid taxes and fees, and (ii) authorizing banks and financial institutions to honor and process all checks and electronic payment requests related to the foregoing.

58.    In the ordinary course of business, the Debtors (a) pay certain taxes (collectively, the "Taxes") and fees and other similar charges and assessments (collectively, the "Fees," and together with Taxes, the "Taxes and Fees") to various taxing, licensing, regulatory, and other governmental authorities (the "Taxing Authorities") in order to conduct their business in the ordinary course of business. The Taxing Authorities include, but are not limited to, those listed on Exhibit B to the

motion (the "List of Taxing Authorities"). Although the Debtors believe that the List of Taxing Authorities is substantially complete, some Taxing Authorities may have been omitted inadvertently. Accordingly, the Debtors reserve the right to supplement or amend the List of Taxing Authorities as needed. Further, the relief requested herein is applicable with respect to all Taxing Authorities and is not limited to those Taxing Authorities listed on the List of Taxing Authorities.

59.     The Taxes and Fees incurred by the Debtors generally consist of production tax, sales and use taxes, franchise and excise taxes, gross receipts taxes, unemployment taxes, and other charges and assessments. Although the Debtors have made an extensive and good faith effort to identify all Taxes, Fees, and Taxing Authorities, the Debtors reserve the right to promptly file supplements to this Motion. In the aggregate, during the 12 month period preceding the Petition Date, the Debtors have paid approximately $895,885.00 in Taxes and Fees to various Taxing Authorities. As of the Petition Date, the Debtors believe they may owe approximately $30,000.00 in natural gas taxes and approximately $4,000.00 in licenses and fees, for which the Debtors are seeking from the Court authorization, but not direction, to pay or to fund. The Debtors do not admit that there is liability with respect to any tax, fee, assessment or other claim against the Debtors. Accordingly, the Debtors seek the Court's authorization, not direction, to pay and or fund any such outstanding amounts.

60.     The Debtors incur certain state and local taxes imposed on the sale of certain goods and services and various other state or local taxes, charges, fines, penalties, and fees, including, without limitation, any amounts required to be incurred,

or collected pursuant to applicable law.  The Debtors' records indicate that, as of the Petition Date, they owe approximately $30,000.00 in production/natural gas taxes that the Debtors would typically pay or fund in the ordinary course of their business with respect to oil and gas operations.  The Debtors are seeking from the Court authorization, but not direction, to pay and/or fund such sales, use, franchise and excise taxes.

61.    The Debtors are also responsible for paying certain federal and state unemployment taxes under federal and state unemployment tax laws in the ordinary course of their business.  As of the Petition Date, the Debtors are current on outstanding unemployment taxes – except for periods between May 15-18 which are accrued within the current payroll cycle.  The Debtors are seeking from the Court authorization, but not direction, to pay such outstanding unemployment taxes.

62.    The Debtors' failure to pay the Taxes and Fees could materially and adversely impact their business operations and threaten the Debtors' reorganization in several ways. First, the Taxing Authorities could initiate additional audits of the Debtors or prolong existing audits, which would unnecessarily divert the Debtors' focus and attention from the tasks required by the reorganization process at a critical time for their businesses. Second, the Taxing Authorities may attempt to suspend the Debtors' operations, or the operations of their affiliates, file liens, seek to lift the automatic stay, and/or pursue other remedies that not only would be administratively burdensome to the Debtors' estates, but could also have disastrous consequences on the Debtors' business operations. Third, the Debtors' failure to pay such Taxes or Fees to the Taxing Authorities could cause the Debtors to incur late fees, penalties, and other

charges.

63.     Accordingly, the Debtors' have a sound business reason for requesting to pay the Taxes and Fees because the failure to pay such Taxes and Fees could have a material adverse impact on the Debtors' day-to-day operations.

**E.     Motion for Order Authorizing Debtors to Pay Pre-Petition Wages and Other Compensation, and Employee Benefits, and Continue Existing Employee Benefit Plans and Programs; Authorizing Banks and Financial Institutions to Pay All Checks and Electronic Payment Requests; Approving the Debtors' Discretionary Employee Incentive Programs**

64.     By this motion, the Debtors are seeking an order (i) authorizing the Debtors, in their sole discretion, to (a) pay pre-petition and post-petition wages and other compensation, employee business expense allowances and reimbursements, employee benefits, and (b) continue existing employee benefit plans and programs, (ii) authorizing banks and other financial institutions to receive, process, honor, and pay all checks and electronic payment requests relating to the foregoing, and (iii) approving the Debtors' discretionary employee incentive programs.

65.     The Debtors' success in their restructuring efforts will be highly dependent on the continued support and performance of its workforce.

66.     Debtors Ricochet and Interests do not have any employees. Management employs the employees who perform a broad spectrum of services for the Debtors, including, without limitation, labor, finance and accounting, and information technology services (the "Employees").

67.     In connection with the salaries and wages paid to Employees, Management also handles as required by law withholding from their Employees' wages amounts related to federal, state, and local income taxes, as well as social

security and Medicare Taxes (collectively, the "Employee Withholding Taxes") and remit same to the applicable taxing authorities.  Management also handles deduction of certain amounts from Employees' paychecks, including, without limitation, garnishments, child support and service charges, and similar deductions.

68.    The Debtors have structured the employment of employees this way to efficiently reduce overhead expenditures and take advantage of the cost savings associated with consolidating back office functions with the other non-debtor companies affiliated with Ricochet/Interests.

69.    A vast majority of the Employees rely exclusively on the payments and other benefits they receive from the Debtors for their basic living necessities. If the Debtors do not pay the obligations for compensation, benefits and reimbursable expenses, the Employees will face significant financial difficulties. Moreover, Employee morale and loyalty will be jeopardized at a time when the support of the Employees is critical to the Debtors' success. In the absence of honoring the Debtors' pre-petition obligations to the Employees, the Employees may seek alternative employment opportunities. Accordingly, it is essential to pay and honor obligations to Employees.

70.    By this Motion, the Debtors request authority to pay all wages to the Employees in the ordinary course of business. The Debtors have made careful inquiries and have taken diligent steps to ensure that none of the Employees are owed more than current accrued wages as of the Petition Date. Accordingly, the Debtors believe that no individual Employee will be paid more than the statutory priority cap if this Court grants the requested relief.

<u>Employee Business Expenses</u>

71.    In the ordinary course of the Debtors' business and as is customary with most large businesses, the Debtors reimburse employees for certain expenses Employees incur in the scope of their employment (the "Reimbursable Expenses"). Most Employees initially incur and pay such expenses by using corporate credit cards. The Reimbursable Expenses are largely composed of ordinary and necessary expenses including cell phone, interne, hotel and airfare charges, meals, equipment, tolls, parking, mileage, employee incentives, and postage.

72.    It would be patently inequitable to require Employees to personally bear any approved business-related expenses they incurred in furtherance of their responsibilities as Employees.

73.    Accordingly, the Debtors request authority, in their discretion and in the exercise of their business judgment, to continue to honor all of the Employees Reimbursable Expenses in the ordinary course of business, regardless of when such obligations arose and to continue to use the corporate credit cards

<u>Vacation, Sick, Holiday and Leave Benefits</u>

74.    Management provides certain of the Employees with paid vacation time (the <u>"Vacation Time"</u>) as well as paid sick time and other paid time off (collectively, with the Vacation Time, the "Paid Time Off"). These programs are typical and customary, and continuing to offer them is necessary for the Employees to remain during the reorganization process.

75.    Because Vacation Time and Paid Time Off are accrued and used by Employees on a continuous basis, it is difficult to precisely quantify the cost of accrued Vacation Time and Paid Time Off as of the Petition Date.

76.    By this Motion, the Debtors seeks authority to: (a) continue to provide Paid Time Off to the Employees in the ordinary course of business; and, (b) continue to honor obligations under such benefit programs, including any premiums and administrative fees it owes to Employees on account of Paid Time Off to the extent that such amounts remain unpaid as of the Petition Date.

77.    The Debtors also seek authority for Management to pay Payroll Taxes and other Deductions to the appropriate entities. These amounts principally represent Employee earnings that Employees, governments and judicial authorities have designated for withholding from Employees' paychecks. Indeed, certain withholdings, including child support and alimony payments, are not property of the Debtors' estates because the amounts were withheld from Employees' paychecks on another party's behalf. In addition to causing undue hardship to certain Employees, the failure to pay such Payroll Taxes and Deductions may result in the Debtors/Management being inundated with inquiries from taxing authorities and garnishors regarding their failure to submit, among other things, taxes and child support and alimony payments, which are not the Debtors' property but have been withheld from Employee paychecks. Moreover, if the Debtors cannot remit these amounts, the affected Employees may face legal action and/or imprisonment due to the Debtors' failure to submit these payments.

78. Further, applicable federal and state laws require the Debtors/Management to withhold certain tax payments from Employees' paychecks and to pay such amounts to the appropriate taxing authority. Moreover, because the Payroll Taxes are not property of the Debtors' estates, the Debtors request that the

Court authorize the Debtors/Management to transmit the Payroll Taxes to the proper parties in the ordinary course of business.

79.    The Debtors submit that the relief requested herein will benefit the Debtors' estates and creditors by allowing the Debtors' business operations to continue without interruption while the Debtors seek to consummate their proposed restructuring. Absent such payments, the Employees may seek alternative employment opportunities. Such a development will deplete the Debtors' workforce, hinder or preclude the Debtors' ability to meet its customer obligations at a time when the Debtors seek to conduct operations in a "business as usual" manner.

### F.    Motion to Establish Critical Vendor Payment Procedures

80.    By this motion, the Debtors seek authority to establish critical vendor payment procedures. In their day-to-day operations, the Debtors heavily rely on many suppliers and service providers. The Debtors believe that the goods and services supplied by certain of their vendors are critical to their operations in that their business, or some arm of their business, could not continue to operate without access to such goods and services. As of the Petition Date, many of the vendors deemed critical by the Debtors have outstanding claims against the Debtors arising from prepetition deliveries of goods and prepetition performance of services. The Debtors anticipate they will be able to continue to transact with a majority of the vendors on which their day-to-day business operations depend despite nonpayment by the Debtors of such vendors' prepetition claims. Nonpayment of the prepetition claims of certain of the Debtors' vendors, however, creates a significant risk of disruption to the Debtors' operations. Thus, the Debtors anticipate there will be instances in which payment of

the prepetition claims of certain vendors will benefit all creditors because such payment will allow the Debtors' business to continue and avoid a likely loss, or to gain a likely economic advantage, disproportionate to the amount of such vendors' prepetition claims.

81.     Accordingly, the Debtors request that the Court establish Critical Vendor Payment Procedures (as defined below) by which the Debtors may pay certain amounts to Critical Vendors (as defined below). In exchange for payment by the Debtors of any Critical Vendor Claim (as defined below), the Debtors intend to require such Critical Vendor to agree to transact with the Debtors, for such duration of time as agreed between the Debtors and such Critical Vendor on Customary Trade Terms (as defined below), unless otherwise agreed by the Debtors and the Critical Vendor.

82.     The Debtors are in the process of evaluating the goods and services vendors likely to have outstanding claims against the Debtors as of the Petition Date. The Debtors are in the process of analyzing which of their providers of goods or services are critical to their ability to operate their business and this would qualify as either Critical Vendors, and believe that numerous will so qualify.

83.     The Debtors are distinguishing "Critical Vendors" according to the following criteria:

      a.     Whether (i) the goods and services supplied by a particular vendor are essential to the continued operation of the Debtors' business or some arm thereof and cannot be obtained from any other vendor, or, could be obtained from another vendor only at such extra cost or at such delay as to outweigh the cost of paying the prepetition claim, or (ii) whether the vendor was in possession of valuable property of the Debtors that is necessary to their ability to generate revenue;

      b.     Whether the cost of paying the prepetition claim of such vendor,

to the extent that such claim is fixed, noncontingent, liquidated, and undisputed (the "Critical Vendor Claim"), is outweighed by the benefit such payment is likely to secure on behalf of the Debtors' estates and other creditors; and

c.    Whether such vendor would likely continue doing business with the Debtors notwithstanding nonpayment of prepetition claims, such as those vendors subject to longterm, non-terminable contractual commitments.

84.    According to the above criteria, the Debtors are considering, from the several thousands of vendors with whom the Debtors deal, a small group of vendors that the Debtors will likely deem to be Critical Vendors. These vendors provide goods, and services to the Debtors necessary to enable the Debtors to retain their reputation, customer loyalty, and goodwill.   In addition, many of the potential Critical Vendors are small companies and any one payment by the Debtors represents a significant portion of their income.

85.    Failure to obtain the necessary goods and services from such vendors would irreparably harm the Debtors' reputation and could result in loss of customer confidence, loyalty and patronage in favor of one of the Debtors' competitors. The Debtors' perceive a risk that, for certain of their Critical Vendors, a default by the Debtors would extinguish the Debtors' access to necessary goods, and services, because (i) the vendor providing the particular good or service will be put out of business by the Debtors' nonpayment, (ii) because the vendor will refuse to continue doing business with the Debtors if their prepetition claim remains unpaid, or (iii) because the vendor may choose to continue doing business with the Debtors only upon the condition that the Debtors provide trade term accommodations such as advance deposits or payments by wire transfer prior to delivery. Additionally, the Debtors believe that vendors in possession of the Debtors' property may assert liens

on such property and/or will not return such property to the Debtors in the ordinary course of business as long as their prepetition claims remain unpaid.

86.     The Debtors anticipate that there may be instances in which the Debtors will require authority to pay the prepetition claim of a Critical Vendor that has refused to continue to deal with the Debtors, that is at risk of going out of business, or that has demanded trade term accommodations the Debtors cannot meet, because the Debtors will be unable to operate their business or an arm thereof without the goods, and services provided by such Critical Vendor. The Debtors feel they will not be able to fulfill their duty to their estate and creditors to preserve the value of their businesses without the authority to pay the prepetition claims of those vendors the Debtors have identified as Critical Vendors as and when such payments prove necessary.

87.     Accordingly, the Debtors propose the establishment of the following procedures for payment of prepetition claims of Critical Vendors if and when such payments become necessary (the "Critical Vendor"):

a.      First, to the extent an entity claims a lien against property of any of the Debtors' estate to secure a Critical Vendor Claim (which lien, upon advice of counsel, the Debtors reasonably believe to be valid) and to the extent payment of such Critical Vendor Claim is, in the exercise of the Debtors' business judgment, in the best interests of their estates (to include agreeing to Customary Trade Terms, defined herein), the Debtors are authorized to pay up to 75% payable over 90 days – 1/3 per month of such Critical Vendor Claim (with the balance agreed to be treated as an unsecured claim) The Debtors shall file with the Court and provide to the United States Trustee for the Western District of Texas (the "U. S. Trustee"), and any committee approved under section 1102 of the Code (the "Creditors Committee," and,together with the U.S. Trustee, the "Notice Parties") an accounting, itemized by claims paid, of any debts so paid.

b.      To the extent an entity asserts any Critical Vendor Claim, the

payment of which the Debtors, upon advice of counsel, reasonably believe would be authorized under existing laws related to critical vendors and payment is in the best interests of the estates (to include agreeing to Customary Trade Terms, defined herein), the Debtors may pay up to 75% payable over 90 days – 1/3 per month of such claim (with the balance to be treated as an unsecured claim) The Debtors shall file with the Court, and provide to the Notice Parties an accounting of each such claim paid, including the bases on which payment of such claim is warranted under existing law. Upon motion of any party in interest filed within thirty (30) days of such accounting, the Debtors (and the creditor paid) shall be required to show cause why payment of such claim should be deemed by the Court to be properly authorized. If the Court determines that a payment was not properly authorized, the Debtors are authorized to, in their discretion and without further order of the Court, declare that payments made to such Critical Vendor on account of its Critical Vendor Claim shall be deemed to have been in payment of then outstanding postpetition claims of such vendor without further order of the Court or action by any person or entity. In addition, such Critical Vendor shall immediately repay to the Debtors any payments made to it on account of its prepetition claim to the extent that the aggregate amount of such payments exceed the postpetition obligations then outstanding, without the right of any setoffs, claims, provision for payment of reclamation or trust fund claims, or otherwise.

c.  Any entity provided with a copy of the Order authorizing these procedures shall be deemed on notice that a refusal to provide postpetition goods, or services to the Debtors by reason of non-payment of any prepetition debt, and despite assurance, in the form of a deposit or prepayment, that such entity will suffer no loss through provision of postpetition goods or services, absent good cause, constitutes a willful violation of section 362(a)(6) of the Code.

88.  As a prerequisite to payment of any Critical Vendor Claim, the Debtors intend to require Critical Vendors to agree to transact with the Debtors postpetition on Customary Trade Terms (as defined below) for such duration of time as agreed to by the Debtors and the particular Critical Vendor, unless otherwise agreed to by the

Debtors and the particular Critical Vendor.

89.    <u>"Customary Trade Terms"</u> are those trade terms, which include, but are not limited to, credit terms, credit limits, historical pricing conventions, historical product volumes, cash discounts, timing of payments, allowances, rebates, normal product mix, and availability and other applicable terms and programs acceptable to the Debtors, that were most favorable to the Debtors and in effect between such Critical Vendor and the Debtors at any time during the 12 month period preceding the Petition Date; provided however, notwithstanding the foregoing, payment terms shall be no less favorable than either 'net 30' (paid 30 days from invoice date) or "net 10 — 2%" (which provides for a 2% invoice discount if the invoice is paid 10 days from invoice date). If after receipt of payment for any Critical Vendor Claim, a Critical Vendor refuses to continue to provide product, supplies or services upon the Customary Trade Terms as agreed to with the Debtors, then the Debtors may (i) declare that any payment made to such Critical Vendor on account of their prepetition claim shall be deemed to have been in payment of then outstanding post-petition claims of such Critical Vendor without further order of the Court or action by any person or entity; (ii) require that the Critical Vendor immediately repay to the Debtors any payments made to it on account of their prepetition claim, without the right of any setoffs, claims, provision for payment of reclamation or trust fund claims, or otherwise; and (iii) seek redress with the Court for failure to comply with the Customary Trade Terms.

90.    In the present case, many of the Critical Vendor claims will be entitled to priority status as administrative expenses and likely payment in full pursuant to

section 503(b)(9) of the Bankruptcy Code because such claims arise from the delivery of goods to the Debtors, in the ordinary course of business, within the 20-day period preceding the Commencement Date.

91.     The Debtors submit that many of the Critical Vendor Claims likely arise from the delivery of goods to the Debtors in the ordinary course of business within the 20-day period preceding the Commencement Date. As such, these Critical Vendor Claims would likely be entitled to administrative expense status and to payment in full ahead of general unsecured creditors. Therefore, authorization of payment of many of the Critical Vendor Claims would not unfairly discriminate against the Debtors' other unsecured creditors and raises merely an issue of timing.

92.     Establishment of the Critical Vendor Payment Procedures by which the Debtors may pay the claims of those vendors whom the Debtors have distinguished as Critical Vendors is warranted. The Critical Vendor Payment Procedures will allow the Debtors to pay the Critical Vendor Claims, many of which will likely be entitled to priority administrative expense status pursuant to Bankruptcy Code section 503(b)(9). The Critical Vendor Payment Procedures will also ensure that no Critical Vendor holds the Debtors hostage and unreasonably demands payment of their prepetition claims. The Debtors believe that authority, but not direction, to pay the Critical Vendor Claims, as such payments become necessary, is crucial for the Debtors' seamless transition into Chapter 11, will avoid immediate and irreparable harm, and will serve the best interests of the Debtors, their estate, and their creditors.

**G.     Motion for Order Determining That Utility Providers Have Been Provided With Adequate Assurance of Payment; Approving Proposed Adequate Assurance Procedures; Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Utility**

**Services; Determining That Debtors Are Not Required to Provide Any Additional Assurance**

93.     By this motion, the Debtors seek an Order (i) determining that utility providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code by virtue of the proposed adequate assurance, (ii) approving the adequate assurance procedures as proposed in the motion, (iii) prohibiting utility providers from altering, refusing, or discontinuing utility services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the adequate assurance procedures, and (iv) determining that the Debtors are not required to provide any additional assurance beyond what is proposed in this motion.

94.     The Debtors incur utility expenses for electricity, telephone, water, waste disposal, internet, and other essential services (collectively "Utility Services") in the ordinary course of their businesses. The utility providers (as that term is used in section 366 of the Bankruptcy Code, collectively, the "Utility Providers") that deliver Utility Services to the Debtors as of the Petition Date include, but are not limited to, those listed on Exhibit C attached to the motion (the "Utility Provider List"). On average, the Debtors spend in the aggregate approximately $1,800.00 each month on Utility Services.

95.     As of the Petition Date, the Debtors were current on their utility bills and obligations to Utility Providers.

96.     Preserving Utility Services on an uninterrupted basis to the Debtors' offices and oil and gas properties is essential to the Debtors' ongoing operations and to the success of its reorganization. Any unplanned interruption of utility services for

even a brief period of time will negatively impact the Debtors' operations, customer and business relationships, revenues, and profits, seriously jeopardizing the Debtors' reorganization efforts. Thus, it is imperative that the Utility Providers continue to provide their Utility Services without interruption.

97.    Accordingly, the Debtors seek approval of the proposed adequate assurance procedures described below in the event that any Utility Provider makes a demand for adequate assurance or otherwise threatens to alter, refuse, or discontinue Utility Service to the Debtors.

Proposed Adequate Assurance

98.    The Debtors are current on all obligations for Utility Services to their Utility Providers. The Debtors intend to pay their post-petition obligations owed to the Utility Providers in the ordinary course, and by this motion also seek to pay all pre-petition amounts, as well, as adequate assurance of payment for Utility Services, in lieu of an additional deposit. The Debtors believe that payment of prepetition amounts is in the best interest of the estates because the Debtors are current on all obligations to Utility Providers and posting, by way of example, one additional month of estimated service for each Utility Provider would far exceed and actually be a greater detriment to the Debtors' cash flow than simply paying the Utility Providers in the ordinary course of business, to include payment of prepetition amounts.

99.    The Debtors also request, as additional adequate assurances, that the Utility Providers be allowed to continue to debit the Debtors' bank accounts for Utility Services, in the ordinary course of business.

100.    The Debtors assert that they have sufficient availability of funds to pay

the amounts described herein in the ordinary course of business by virtue of cash reserves and expected cash flows from business operations, as well as expected debtor-in-possession financing.

101.    The Debtors submit that payment of any prepetition amount owed, in the ordinary course of business, and in conjunction with the continued ability to debit the Debtors' accounts for amounts owed, demonstrates the Debtors' ability to pay for future Utility Services in the ordinary course of business and constitutes adequate assurance to the Utility Providers (the "Proposed Adequate Assurance").

Proposed Adequate Assurance Procedures

102.    Notwithstanding the Proposed Adequate Assurance and the fact that many Utility Providers are holding individual pre-petition Security Deposits, if any Utility Provider believes that additional adequate assurance is required, it may request such additional assurance pursuant to the procedures described below (the "Adequate Assurance Procedures"):

a.    Any Utility Provider requesting additional assurance of payment in the form of deposits, prepayments, or otherwise must serve a request for additional assurance (an "Additional Assurance Request") so that it is received by the following parties: (i) the Debtors, 16111 Via Shavano, San Antonio, Texas 78249; (ii) proposed counsel to the Debtors, Michael G. Colvard, Martin & Drought, P.C., Bank of America Plaza, 25th Floor, 300 Convent Street, San Antonio, Texas 75205; (iii) the Office of the United States Trustee for the Western District of Texas (the "U.S. Trustee"), 615 E. Houston Street, Suite 533, San Antonio, TX 78205 (collectively, the "Notice Parties").

b.    Any Additional Assurance Request must (i) be made in writing, (ii) set forth the location for which Utility Services are provided, (iii) include a summary of the Debtors' payment history relevant to the affected account(s), including any Pre-petition Security Deposits, and (iv) set forth why the Utility Provider believes that the Proposed Adequate Assurance is not sufficient adequate

assurance of future payment in accordance with section 366 of the Bankruptcy Code.

c.      Upon the Debtors' receipt of any Additional Assurance Request in accordance with the notice procedures described above, the Debtors shall have the greater of (i) twenty (20) calendar days from the receipt of such Additional Assurance Request or (ii) thirty (30) calendar days from the Petition Date (collectively, the "Resolution Period") to negotiate with the Utility Provider to resolve such Utility Provider's Additional Assurance Request.

d.      The Debtors may, in their sole discretion, resolve any Additional Assurance Request by mutual agreement with the Utility Provider and without further order of the Court, and may, in connection with any such agreement, in its sole discretion, provide a Utility Provider with additional assurance of future payment, including, but not limited to, cash deposits, prepayments, or other forms of security, without further order of the Court if the Debtors believe that such additional assurance is reasonable. Any such agreement may include a recharacterization of some or all of the Debtors' payment for prepetition Utility Services as a post-petition Adequate Assurance deposit.

e.      If the Debtors determine that the Additional Assurance Request is not reasonable and is not able to reach an alternative resolution with the Utility Provider during the Resolution Period, the Debtors, during or immediately after the Resolution Period, will request a hearing before the Court to determine the adequacy of assurances of payment with respect to such Utility Provider (the "Determination Hearing") pursuant to section 366(c)(3) of the Bankruptcy Code. Any Determination Hearing scheduled will be without prejudice to the Debtors to seek return of any prepetition payments for Utility Services provided as Adequate Assurance, should the Utility Provider request additional security deposits as adequate assurance.

f.      Pending resolution of such dispute at the Determination Hearing, the relevant Utility Provider shall be prohibited from discontinuing, altering, or refusing service to the Debtors for any reason, to include on account of any objections to the Proposed Adequate Assurance.

g.      The Debtors will either fax, e-mail, serve by first class mail, or otherwise expeditiously send a copy of this Motion and the

Orders, which include the proposed Adequate Assurance Procedures, to each Utility Provider within five business days after entry of the Orders by the Court.

h. The Adequate Assurance Deposit attributable to each Utility Provider shall be returned to the Debtor on the earlier of (a) the Debtor's termination of such services from such provider; (b) the confirmation of a plan of reorganization; and (c) the conclusion of the Chapter 11 Cases, if not applied earlier.

103. The Debtors further propose that all Utility Providers that do not timely file an objection to this motion, or make an Additional Assurance Request pursuant to the Adequate Assurance Procedures, be deemed to consent to the Proposed Adequate Assurance and be bound by any order entered by the Court granting this motion.

<u>Modifications to Utility Provider List</u>

104. The Debtors intend to amend the Utility Provider List, in their sole discretion, to add any subsequently identified Utility Provider. The Debtors further propose that the Interim Order and Final Order (together, the <u>"Orders"</u>) be deemed to apply to any such Utility Provider regardless of when a Utility Provider may be added to the Utility Provider List. The Debtors also will serve a copy of this Motion on any Utility Provider that is subsequently added to the Utility Provider List. Such subsequently added Utility Providers who object to Orders or to the entry of the Orders must file an objection in accordance with the Bankruptcy Rules, the Local Rules of Court, and the Adequate Assurance Procedures.

105. Here, the Debtors believe that the Utility Providers have "adequate assurance of payment" even without the proposed Adequate Assurance Deposit. As described above, the Debtors anticipate having sufficient resources to pay, and intend

to pay, any and all valid post-petition obligations for Utility Services in a timely manner. In addition, the Debtors' reliance on Utility Services for the operation of their business provides them with a powerful incentive to stay current on their utility obligations. These factors, which the Court may (and should) consider when determining the amount of any adequate assurance payments, justify a finding that no adequate assurance payments other than staying current on both pre and post-petition amounts owed are required in the Chapter 11 Cases. The Debtors submit that the Proposed Adequate Assurance is sufficient to assure the Utility Providers of future payment.

106.    Notwithstanding the foregoing, the Debtors believe that the Proposed Adequate Assurance and the Adequate Assurance Procedures are reasonable, satisfy the requirements of section 366 of the Bankruptcy Code, and are necessary for the Debtors to carry out their reorganization efforts. If they are not approved, the Debtors could be forced to address payment requests by Utility Providers in a disorganized manner, which would distract management from focusing on the Debtors' reorganization. Moreover, on the 30th day following the Petition Date, the Debtors could be surprised by a Utility Provider unilaterally (a) deciding that it is not adequately protected, (b) making an exorbitant demand for payment to continue service, or (c) discontinuing service. Such discontinuation of or higher payment demands for Utility Services could jeopardize the Debtors' reorganization efforts.

107.    The proposed Adequate Assurance Procedures are necessary for the Debtors to carry out their restructuring efforts. If the Court does not approve the proposed Adequate Assurance Procedures, the Debtors could be forced to address

requests from Utility Providers in a disorganized manner at a critical point in the restructuring process.

108.    In this case, preserving Utility Services on an uninterrupted basis is essential to the Debtors' ongoing operations. Indeed, any interruption in Utility Services, even for a brief period of time, would immediately and irreparably harm the Debtors' business. Accordingly, it is imperative that the Utility Providers continue to provide their Utility Services without interruption.

**H.    Motion for Authority for the Debtors to Use Cash Collateral, Obtain Debtor In Possession Financing, and Determining Adequate Protection, Superpriority Claim and Liens**

109.    To continue their operations in an orderly manner on a post-petition basis, the Debtors need immediate authority to utilize cash collateral secured by liens on the property of Interests, secured creditor The J.O. Walker, Jr. Family Limited Partnership ("J.O. Walker, Jr.").   The Debtors intend to borrow enough funds to operate in the ordinary course of business during these bankruptcy Cases.

110.    The Debtors further seek permission from this Court to use cash collateral, as set forth in the Budget, to fund ongoing operations.

111.    The Debtors require immediate access to the cash collateral to, among other things, fund any interim obligations.

112.    Accordingly, the Debtors request that the Court authorize the Debtors to immediately use the cash collateral in the amounts set forth in the Budget, pending a final hearing. At the final hearing, the Debtors request that the relief requested be granted on a permanent basis.

113.    The J.O. Walker, Jr. is willing to allow Debtors to use cash collateral to

enable the Debtors to operate during these bankruptcy Cases, but only on the terms described in the Motion.

114.    Under the circumstances, the Debtors have concluded that J.O. Walker, Jr. is adequately protected.  On these facts, I believe the relief requested is warranted.

## IV.    Motion for Order Authorizing Payment of Working Interest and Royalty Owners

115.    Ricochet operated various oil and gas properties.  Ricochet's duties as operator include the obligation to receive and distribute income from oil and gas production to working interest and royalty owners.  Production income distributed to Ricochet includes income attributable to numerous working interest and royalty owners, which Ricochet distributes to working interest and royalty owners upon receipt from the purchaser.  Ricochet within its ordinary course of business receives, accounts for and distributes production proceeds to working interest and royalty interest owners.

116.    Failure to distribute working interest and royalty interest income to owners could result in additional lien filings and exposure to claims for damages. Further funds held by Ricochet for payment of working interest and royalty owners are funds which are owned by working interest and royalty owners – and not constitute property of the bankruptcy estate.  Termination of oil and gas leases could result from non-payment of royalty owners and would damage prospects of reorganization to Ricochet's reorganization efforts and could damage the bankruptcy estate.

117.    Ricochet requires an order authorizing the payment of any pre and post petition income earmarked for payment of working interest and royalty owners.

## IV.    Conclusion

118.    In conclusion, for the reasons stated herein and in each of the First Day Motions filed concurrently or in connection with the commencement of these cases, I respectfully request that each of the First Day Motions be granted in its entirety, together with such other and further relief as this Court deems just and proper.

I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth in this Declaration, the foregoing is true and correct.

/s/ Jerry L. Hamblin
_____
Jerry L. Hamblin
President and CEO for Ricochet
Energy, Inc., Manager of Ricochet
Management, LLC, as General Partner
of Ricochet Interests, Ltd.